**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MARTHA LAWS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:14-CV-3683-B (BH)** |
| | § | |
| **CAROLYN COLVIN, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the order of transfer dated January 27, 2015, this case has been transferred for all further proceedings and entry of judgment.  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED,** and the case is **REMANDED** for reconsideration.

**I.   BACKGROUND**

**A.   Procedural History**

Martha Lynn Laws (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits (DIB) under Title II of the Social Security Act and for supplemental security income (SSI) under Title XVI of the Social Security Act.[1]  On July 11, 2013, Plaintiff applied for DIB and SSI, alleging disability beginning on March 3, 2012, due to a history of heart attacks.  (R. at 223-245, 280, 223-244.)  Her applications were denied initially and upon reconsideration.  (R. at 145-152, 157-162.)  She timely

---

[1]  The background information is summarized from the record of the administrative proceedings, which is designated as "R."

requested a hearing before an Administrative Law Judge (ALJ), and she personally appeared and testified at a hearing on April 22, 2014. (R. at 77-104, 165-166.)  On May 30, 2014, the ALJ issued her decision finding Plaintiff not disabled.  (R. at 19-28.)  The Appeals Council denied her request for review on September 15, 2014, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-3)  She timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  (*See* R. at 1; doc. 1.)

### B.    Factual History

#### 1.    Age, Education, and Work Experience

Plaintiff was born on April 19, 1957.  (R. at 280.)  She had a high school education and had past relevant work as a "sales worker, general hardware" and a material handler.  (R. at 91, 97-98.)

#### 2.    Medical, Psychological and Psychiatric Evidence

On March 26, 2012, Plaintiff presented to the emergency department at Parkland Memorial Hospital (Parkland) complaining of chest pain. (R. at 399.)  She reported that the pain, which was located in her heart, was not constant but had presented several times in the past month. (*Id.*)  The pain was non-radiating, moderate in severity, sharp and achy in character, and it palliated with deep breaths. (*Id.*)  She claimed that she knew it was heart pain because she had that pain with emotional trauma in the past. (*Id.*)  She also reported that for the past month she had had welps that were relieved with mint serum, and she believed her body was excreting poisons. (*Id.*)  She was diagnosed with chest pain, unspecified.  (R. at 408.)

On May 7, 2012, Plaintiff returned to the emergency department at Parkland for evaluation of chest pain.  (R. at 362, 410.)  She reported that her chest pain had been present for approximately 3 months intermittently, and food made her symptoms worse.  (R. at 410.)  She could walk half a

block before needing to rest for up to 8 minutes.  (R. at 412.)  She requested that the treating doctor fill out disability paperwork for housing, and the doctor explained that the emergency department could not do that for her.  (*Id*.)  Plaintiff was diagnosed with shortness of breath; chest pain, unspecified; gastroesophageal reflux disease (GERD); and pulmonary nodules.  (R. at 362.)

On July 17, 2012, Plaintiff reported to Dr. Robert A. Harris at Texas Internal Medicine Associates for a Texas Rehabilitation Commission examination.  (R. at 371.)  She complained of dyspnea, or shortness of breath, on exertion for the last 4 months.  (*Id*.)  She had an occasional wheeze but no substantial sputum production.  (*Id*.)  She also smoked about 10 cigarettes per day. (R. at 372.)  Plaintiff reported occasional chest pain on her right, left, or central chest that occurred 2 or 3 times per month for a few minutes each time.  (R. at 371.)  Dr. Harris noted that she was prescribed antireflux medicine for GERD when she was at the emergency department at Parkland, but she never filled the prescription because she could not afford it.  (*Id*.)  Upon physical examination, her chest was clear of auscultation and percussion and had no rales, rhonchi, or wheezes.  (*Id*.)  A chest x-ray revealed a cardiothoracic ration of 13/28, and there was atelectasis in the left middle lung field as well as multiplied granuloma in both lungs.  (R. at 372.)  No infiltrates or masses were noted, however.  (*Id*.)  He diagnosed her with dyspnea on exertion and "chest pain not other specified - possibly due to GERD."  (*Id*.)

Plaintiff presented to Baylor University Medical Center Dallas (Baylor) on August 3, 2012. (R. at 389.)  She received a pulmonary function test, which revealed no need for bronchodilator therapy at that time.  (*Id*.)

On August 9, 2012, Dr. Yvonne Post, D.O., a state agency medical consultant (SAMC), completed a Physical Residual Functional Capacity (RFC) assessment for Plaintiff.  (R. at 374-381.)

She noted a primary diagnosis of emphysema and a secondary diagnosis of GERD.  (R. at 374.)  She

opined that Plaintiff had the physical RFC to lift and/or carry 20 pounds occasionally and 10 pounds

frequently; to stand and/or walk (with normal breaks) for at least 6 hours in an 8-hour workday; sit

(with normal breaks) for about 6 hours in an 8-hour workday; push and/or pull an unlimited amount

of weight with hand and/or foot controls; occasionally climb ramps, stairs, ladders, ropes, or

scaffolds; frequently balance and stoop; occasionally kneel or crawl; frequently crouch; and no

manipulative, visual, communicative, or environmental limitations.  (R. at 375-378.)  In support of

her findings, Dr. Post noted that the exertional limitations were given based on Plaintiff's allegations

of shortness of breath on exertion as well as her chest pain, GERD, and pulmonary nodules.  (R. at

375.)  She found that the evidence of record showed atypical chest pain likely related to GERD, and

she referenced Plaintiff's chest x-rays and notes from her Parkland emergency department visits.

(R. at 375-376.)  She also noted that when Plaintiff was asked about her stress and whether she had

emotional/mental issues that limited her ability to work, she stated that she had no mental issues that

affected her.  (R. at 376.)

On April 19, 2013, Plaintiff presented to Parkland complaining of a sudden onset of chest

pain the night before associated with shortness of breath.  (R. at 429.)  The pain was worse with

breathing and exertion, but not worse with food.  (*Id*.)  She also had nausea, dizziness, and weakness.

(R. at 432.)  She had shortness of breath with exertion, but she paradoxically stated that she could

walk 1 to 2 miles.  (*Id*.)  She was positive for cough, sputum production, and dyspnea, but she had

no hemoptysis, wheezing, or pain on exertion.  (R. at 433.)  It was determined that she presented

with a non-ST segment elevation myocardial infarction or heart attack.  (R. at 435-436.)

On April 22, 2013, she received a stent in her right femoral artery due to coronary artery

disease.  (R. at 437.)

Plaintiff was admitted to Parkland on May 3, 2013, for an examination following her stent placement.  (R. at 490-491.)  She had no further chest pain after the stent was placed other than an episode while she was sleeping, and it resolved spontaneously.  (*Id.*)  She admitted to not taking her aspirin "faithfully."  (*Id.*)  She also admitted to continuing smoking and not wanting to stop.  (*Id.*)  She refused cardiac rehabilitation stating: "I've got that covered because I walk a lot and I'm not interested."  (*Id.*)  It was noted that she had somewhat pressured speech and was tangential at times.  (*Id.*)  She was assessed with coronary artery disease and counseled on smoke cessation and medication compliance.  (*Id.*)

On May 22, 2013, Plaintiff was seen at Parkland for a skin rash with no associated symptoms.  (R. at 496.)  She was assessed with allergic dermatitis and was prescribed a topical steroid cream to help relieve itching and redness.  (R. at 497-498.)

On August 6, 2013, Plaintiff presented to Parkland for a follow-up examination regarding her rash.  (R. at 531.)  Her rash was better after use of the cream.  (*Id.*)  Her blood pressure was mildly elevated, and she did not take her blood pressure medication, Metoprolol, because she could not tolerate it.  (R. at 533.)  She also requested a letter from the doctor "for shelter," and her treating doctor noted that she currently lived at a homeless shelter.  (R. at 531.)

She returned to Parkland on November 21, 2013, complaining of chronic back pain for several years.  (R. at 512.)  She reported that she had not had any chest pains since her stent placement, and she stopped taking Metoprolol because it made her dizzy.  (*Id.*)  Physical examination revealed effortless breathing, no respiratory distress, and no wheezes.  (R. at 513.)  It also revealed mild tenderness to palpation of the lumbosacral spine, but a straight leg raising test was

negative bilaterally.  (*Id*.)  Plaintiff was assessed with chronic back pain, hypertension, and GERD.
(*Id*.)  X-rays of her lumbar spine showed degenerative changes, and no significant acute radiographic
abnormalities were seen.[2]  (R. at 516.)

### 3.   Hearing Testimony

On April 22, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the
ALJ.  (R. at 77-104.)  Plaintiff was represented by an attorney.  (*See* doc. 79.)

#### a.   *Plaintiff's Testimony*

Plaintiff testified that she had a high school education.  (R. at 91.)  She had not had a full-
time job since 1999.  (R. at 81.)  She worked on and off for Strata Enterprises as an "air compressor
man" or an "auto AC man" from 1999 to 2004.  (R. at 82.)  In 2008, she worked as a stocker for
Quick Turn Merchandising, a garden shop for Lowes, for about 4 months.  (R. at 81-82.)  She had
no felony convictions and no minor children.  (R. at 86.)  Her driver's license had expired.  (*Id*.)

Plaintiff had been homeless since September 2012, and resided at an emergency overnight
shelter called the Austin Street Center Shelter.  (R. at 88.)   She had also been homeless at some
point prior to that because she could not find work.  (*Id*.)  She had been estranged from her family
for about 9 to 10 years due to a "conflict[] of personalities."  (R. at 89.)  Her latest husband was
deceased, and she had a prior marriage that was annulled. (*Id*.)  She also had a son and daughter.
(*Id*.)

---

[2] On September 16, 2014, following the ALJ's decision, Plaintiff's attorney submitted to the Appeals
Council medical records from Parkland dated June 18, 2014.  (R. at 17.)  According to the records, Plaintiff
presented to Parkland due to pain located across her entire chest.  (R. at 26.)  Her symptoms had been intermittent,
and she had two episodes lasting less than 1 hour each.  (*Id*.)  The pain was associated with shortness of breath,
nausea, vomiting, and diaphoresis. (*Id*.)  A review of symptoms revealed Plaintiff was positive for chest pain,
palpitations, shortness of breath, and nausea, but she was negative for neck pain and back pain.  (*Id*.)  A chest x-ray
revealed no acute findings.  (R. at 31.)

Plaintiff had a stent placed in her heart after her first heart attack.  (R. at 84.)  She testified that she had a total of 4 heart attacks, although she was only hospitalized and diagnosed for the fourth one.  (R. at 85.)  She took all her medication as prescribed on a regular basis.  (R. at 85-86.)  Plaintiff was told by Baylor that she had 60 percent lung capacity and scarring on her lungs.  (*Id.*)  If she moved too quickly or too long, she became short of breath.  (R. at 87.)  She smoked between 3 to 7 cigarettes a day.  (*Id.*)  She was 5 feet 1 inch tall and weighed 145 pounds, but she had lost weight due to stress.  (R. at 91.)

Plaintiff was able to lift around 15 to 16 pounds, and she could be on her feet for 10 minutes at a time.  (R. at 87-88.)  She had problems with her lower back after sitting for about a maximum of 45 minutes.  (R. at 88.)  She had a tendency to try to doze off if she sat still too long, and it took her a few minutes to stand up and walk.  (*Id.*)  She had "psychosomatic because ... stress symptoms [came] out on [her] muscles."  (*Id.*)  When she asked for a non-narcotic muscle relaxant, the doctor took an x-ray of her back.  (R. at 91.)  She was not notified of the results of the x-ray, so she presumed she did not have any physical damage to her back.  (*Id.*)  She had muscle spasms throughout her body.  (*Id.*)  When she was stressed, her mind and behavior pattern did well, but her body locked up like a "rusty old gear."  (*Id.*)  She experienced situations where she dropped to her knees and could not move.  (R. at 93.)  Her hand would also lock up, and she could feel her trigger finger popping when she tried to move it.  (R. at 94.)  She had not been treated for any mental health issues.  (R. at 92.)

Plaintiff walked at least two miles every morning no matter what the weather was like, although it took her longer to do it than it had in the past.  (R. at 91-92.)  She had to lean on her cart that held her belongings by the time she walked about a third of a football field.  (R. at 94.)  She

could manage to get things done, but it took 3 times as long to get them done.  (R. at 92.)

Plaintiff had, at times, slept from 4:30 in the afternoon to 4:30 in the morning.  (R. at 93.)
She believed her fatigue would give her a problem on a job.  (*Id.*)  She also had an overactive
bladder, which was worse than her heart problem. (R. at 94-95.)  She had to go to the bathroom five
times that morning in the building where the hearing was held. (R. at 95.)  The medication she took
for her bladder had not been working.  (*Id.*)  Plaintiff testified that she had mini-strokes.  (R. at 96.)
She was not taking any medication  for it, but she was on blood pressure medication.  (*Id.*)  She still
had problems with acid reflux, but it was not what it used to be.  (*Id.*)

### b.      *VE's Testimony*

The VE testified that they were looking at a combination of titles regarding Plaintiff's past
relevant work, considering her position at Lowes. (R. at 97.)  Plaintiff had past relevant work history
as a "sales person, general hardware" (DOT 279.357-050).  (*Id.*)  That job was traditionally defined
as light work, but based on Plaintiff's description,  the VE testified that she thought Plaintiff's past
relevant work was heavy and semiskilled, with an SVP of 4.  (R. 97-98.)  The VE also added a
classification as a material handler (DOT 929.687-030, heavy.)  (R. at 97.)  It was traditionally
defined as having an SVP of 3, but she would probably lower it to a 2 since Plaintiff did not operate
a forklift, which would make it unskilled.  (R. at 98.)

The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education,
and work experience could perform Plaintiff's past relevant work if she could lift/carry 50 pounds
occasionally and 25 pounds frequently; stand/walk/sit for 6 out of 8 hours; frequently climb ropes
or stairs; occasionally climb stairs, ropes, or scaffolds; frequently stoop; and understand and carry
out details, but not complex instructions.  (*Id.*)  The VE testified that the hypothetical person could

perform Plaintiff's past relevant work as it is customarily performed as a "sales person, general" but not how Plaintiff performed it.  (*Id*.)  There would also be other work the person could perform.  (*Id*.) The medium, unskilled occupational base[3] of 925 classifications would "erode" to approximately 712 classifications.  (R. at 98-99.)  A few examples of positions in the remaining occupational base would be a sandwich maker (DOT 317.664-010, medium, SVP:2), with approximately 3,800 jobs in Texas, and 62,000 jobs nationally; a dining room attendant (DOT 311.677-018, medium, SVP:2), with approximately 6,000 jobs in Texas and 63,000 jobs nationally; and a kitchen helper (DOT 318.687-010, medium, SVP:2), with approximately 15,000 jobs in Texas and 186,000 jobs nationally.  (R. at 99.)

Plaintiff's attorney then presented a hypothetical for a person of Plaintiff's age, education, and work experience who could lift 16 pounds occasionally; walk/stand/sit for 6 out of 8 hours; alternate sitting and standing after sitting 45 minutes; could not climb ropes, ladders, or scaffolds; could occasionally climb ramps and stairs; and could occasionally bend, stoop, crouch, and squat. (*Id*.)  The VE testified that a person with those limitations would not be able to perform Plaintiff's past relevant work.  (R. at 100.)  There would, however, be one classification concerning Plaintiff's past relevant work that would transfer: the sales position would transfer to a position as a telephone solicitor (DOT 299.357-014, sedentary, SVP:3), with approximately 78,000 jobs in Texas and 1 million jobs nationally.  (*Id*.)  The VE testified that this would not be an exact transfer, so there would be some vocational adjustment for an estimated 3 months.  (R. at 100-101.)  For example, some telephone solicitors simply dial from a telephone while others utilize automatic dialing from

---

[3]The term "occupational base" means the approximate number of occupations that an individual has the RFC to perform.  Social Security Regulation (SSR) 83-10, 1983 WL 31251, at *7 (1983).

a computer-generated program.  (R. at 101.)

Plaintiff's attorney next modified the ALJ's original hypothetical to limit the person to simple instructions.  (*Id.*)  The VE testified that the modification would not have any impact on the 700 job classifications.  (*Id.*)  It would also preclude transferability to light work.  (R. at 102.)

He then added the limitation that the hypothetical person needed to lie down due to fatigue longer than an hour during the workday and needed about 3 restroom breaks in an hour.  (*Id.*)  The VE testified that needing to lie down during the course of an 8-hour day would preclude all competitive work.  (R. at 102-103.)  As to the restroom breaks, she stated that generally speaking, an individual could be off task on an unskilled level if she were not working with the public 1 to 6 minutes per hour.  (R. at 103.)  If she were off task 3 times an hour, that would  probably be excessive time.  (*Id.*)

## C.    **ALJ's Findings**

The ALJ issued her decision denying benefits on May 30, 2014.  (R. at 19-28.)  At step one, she found that Plaintiff had not engaged in substantial gainful activity since March 3, 2012, the alleged onset date.  (R. at 51.)  At step two, the ALJ found that Plaintiff had one severe impairment: ischemic heart disease with a history of myocardial infarction.  (*Id.*)  She also found that Plaintiff had GERD and dermatitis, but the evidence did not establish work-related limitations secondary to these impairments.  (*Id.*)  Additionally, the record failed to establish medically determinable transient ischemic attacks.  (*Id.*)  Despite those impairments, at step three, she found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 51-52.)  The ALJ next determined that Plaintiff had the RFC to lift/carry 25 pounds frequently and 50 pounds occasionally; stand/walk for

6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently stoop; and perform detailed, not complex, instructions. (R. at 52.) At step five, considering Plaintiff's age, education, work experience, and RFC, she found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. (R. at 54.) Accordingly, she determined that Plaintiff had not been disabled within the meaning of the Social Security Act from March 3, 2012 through the date of her decision. (*Id.*)

## II.   ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*. at 436 and n.1.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

B.      **Issues for Review**

Plaintiff presents two issues for review:

> 1.  The ALJ's RFC is not supported by substantial evidence under *Ripley* because no physician has endorsed the limitations the ALJ identified, and even the State agency physicians considered [Plaintiff] more limited than the ALJ recognized.
>
> 2.  The ALJ's step two severity finding does not address [Plaintiff's] severe degenerative disc disease of the lumbar spine. Consequently, the decision is not supported by substantial evidence, and remand is required.

(doc. 19 at 10.)

C.      **RFC Assessment**

Plaintiff contends that the ALJ's RFC is not supported by substantial evidence and requires remand because no physician has endorsed the limitations for a medium RFC, and therefore the ALJ has no basis for the RFC she issued.  (doc. 19 at 11.)

Residual functional capacity is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  He may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record

14

indicates that such a limitation or restriction exists. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Relying primarily on the Fifth Circuit's opinion in *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence because there is no medical source statement from which the ALJ could infer a medium RFC finding. (doc. 19 at 12.) In *Ripley*, the ALJ found that the claimant could perform sedentary work even though there was no medical evidence or testimony to support that conclusion. 67 F.3d at 557. The Fifth Circuit instructed that when no medical statement of a claimant's RFC is provided, the court must focus on whether the ALJ's decision is supported by substantial evidence in the record. *Id*. In that particular case, the Fifth Circuit noted that the record contained a vast amount of evidence establishing that the claimant had a back problem, but it did not clearly establish the effect the

condition had on his ability to work. *Id*. It remanded the case with instructions to the ALJ to obtain

a report from a treating physician regarding the effects of the claimant's back condition on his ability

to work. *Id*. at 557-58. Notably, the Fifth Circuit rejected the Commissioner's argument that the

medical evidence that discussed the extent of the claimant's impairment substantially supported the

ALJ's RFC assessment because it was unable to determine the effects of the claimant's condition,

no matter how small, on his ability to work absent reports from qualified medical experts. *Id*. at 558

n. 27. According to *Ripley*, in order to be substantial, the evidence must focus on the effects that

medical impairments have on a claimant's ability to work. *See id*. at 557-58; *see also Browning v.*

*Barnhart*, No. 1:01-cv-637, 2003 WL 1831112, at *7 (E.D. Tex. Feb. 27, 2003).

The Commissioner contends that the ALJ explicitly considered Dr. Post's RFC assessment

but noted that it did not take into account all of the medical evidence before the ALJ. (doc. 20 at 5.)

She claims that the ALJ identified at least 3 opinions by examining physicians indicating completely

normal cardiovascular, pulmonary, and respiratory function dating back to April 2013. (*Id*. at 6.)

Therefore, she argues that the medical evidence supports the ALJ's decision. (*Id*.)

The ALJ's opinion states that she was not convinced that the objective evidence supported

Dr. Post's opinion that Plaintiff could not perform a modified range of light work. (R. at 53.) She

found that Dr. Post appeared to place significant weight on subjective reports of dyspnea, because

a physical examination of Plaintiff showed that her lungs were clear to auscultation and percussion

with no rales, rhonchi, or wheezes, and pulmonary function studies revealed no indication for

bronchodilator. (*Id*.) The ALJ found that these findings did not support the chronic dyspnea alleged

or establish functional limitations consistent with the RFC given by Dr. Post, who relied on

diagnostic studies that showed atelectasis in the left lung and multiple calcified granuloma bilaterally

16

in reaching her opinion.  (*Id*.)

 In her discussion of the medical evidence, the ALJ noted that while Plaintiff ultimately required a stent placement for coronary artery disease following the April 2013 myocardial infarction, the evidence showed that her overall health stabilized despite medication compliance issues.  (*Id*.)  She pointed out that in May 2013, Plaintiff was not compliant with her medication, acknowledged walking a lot, and was not interested in cardiac rehabilitation because she had it "covered."  (*Id*.)  She also pointed out that in November 2013, Plaintiff denied chest pain for the past 10 months and demonstrated a normal heart rate and rhythm, effortless breath sounds, and no respiratory distress or wheezes.  (*Id*.)  The ALJ found that these findings did not support the degree of limitation supported by Dr. Post.  (*Id*.)  She also found that the medical evidence showed that one of the primary reasons Plaintiff returned for medical care in the months following her myocardial infarction was to obtain a medical source statement to support her need for shelter.  (*Id*.)

In supporting her RFC assessment, the ALJ stated that Plaintiff's symptoms, which did not preclude her from spending her days walking on the streets and carrying her belongings, would not preclude her from lifting/carrying 25 pounds frequently and 50 pounds occasionally; standing/walking for 6 hours in an 8-hour workday; frequently climbing ramps and stairs; occasionally climbing ladders, ropes, and scaffolds; and being able to stoop and follow detailed but not complex, instructions.  (R. at 54.)  The ALJ stated that she included mental limitations in function based on allegations of fatigue and residual pain, which were symptoms that could be expected to affect concentration and on-task behavior, as well as progress notes that showed Plaintiff had been  described as "overly concerned with many chronic complaints" and had pressured speech and tangentiality.  (*Id*.) Finally, she noted that her decision was "based on updated evidence that was

not available for review by the State Agency, and a different interpretation of the evidence reviewed by the State Agency physician."  (*Id.*)

As noted, the ALJ's decision reflects that she was not convinced that the objective evidence supported Dr. Post's opinion.  While she may choose to reject Dr. Post's opinion, "[s]he cannot independently decide the effects of Plaintiff's ... impairments on [her] ability to work, as that is expressly prohibited by *Ripley*."  *Shugart v. Astrue*, No. 3:12-cv-1705-BK, 2013 WL 991252, at *5 (N.D. Tex. Mar. 13, 2013).  Therefore, in order for the ALJ's decision to be supported by substantial evidence, she must have relied on another medical opinion in the record regarding the effects Plaintiff's impairments had on her ability to work.

The record includes treating sources' medical evidence, including clinical notes and lab reports, establishing that Plaintiff suffers from ischemic heart disease with a history of a heart attack, which the ALJ acknowledged.  None of that evidence addressed the effects of her conditions on her ability to work, however.  *See Browning*, 2003 WL 1831112, at *7 (finding despite the fact that there was a vast amount of treating sources' medical evidence in the record establishing that plaintiff suffered from certain physical impairments, including voluminous progress reports, clinical notes, and lab reports, "none [made] any explicit or implied reference to effects these conditions h[ad] on claimant's ability to work" and the ALJ could not rely on that "raw medical evidence as substantial support for" the claimant's RFC).[4]

---

[4] According to the Disability Determination Explanations for Plaintiff's claim at the initial and reconsideration levels, two physical RFC assessments were given by SAMCs on August 16, 2013 and November 12, 2013.  (R. at 110, 128-129.)  Neither assessment is contained in the medical evidence of record, and neither party mentions them.  The ALJ did not analyze or mention them in her decision.  Because they are not part of the medical evidence of record and were not relied upon by the ALJ, they do not constitute medical evidence supporting the ALJ's RFC finding.  *See Rodriguez v. Colvin*, No. 4:12-cv-825-Y, 2013 WL 6704882, at *7 (N.D.Tex. Dec. 19, 2013)(finding that because the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's impairments on her ability to perform work, there was no evidence supporting the ALJ's RFC

The ALJ rejected the only medical opinion in the record that she had analyzed that discussed the effects Plaintiff's impairments had on her ability to perform work.  Accordingly, there is no medical evidence supporting the ALJ's RFC finding.[5]  *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009)( "[a]n ALJ may not–without the opinions from medical experts–derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *Knapp v. Colvin*, No. 3:13-cv-4396-K, 2015 WL 1181955, at *11-12 (N.D.Tex. Mar. 12, 2015)(finding the ALJ impermissibly relied on his own medical opinion in finding the claimant's back impairments had no effects on his ability to work where the ALJ rejected the only opinion from a physician regarding the claimant's ability to work despite his back impairment); *Medendorp v. Colvin*, No. 4:12-cv-687-Y, 2014 WL 308095, at *6 (N.D.Tex. Jan. 28, 2014)(finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination); *Hamblen v. Colvin*, No. 3:12-cv-2009-BH, 2013 WL 4858750, at *12 (N.D.Tex.Sept. 12, 2013)(finding the ALJ impermissibly relied on her own medical opinions to find that the claimant's gastro-intestinal impairments had no effects on his ability to work where there was no evidence in the record showing

---

determination).

[5]The only other evidence the ALJ considered concerning the effects Plaintiff's impairments have on her ability to work came from Plaintiff's testimony at the hearing.  In making her RFC determination, the ALJ noted that Plaintiff's activity of walking everyday and carrying her belongings.  (*See* R. at 54.)  Although Plaintiff testified that she walked everyday, she claimed she walked two miles a lot slower than she had in the past, and she had to lean on the cart she used to carry her belongings for support at some point during her walk.  (*See* doc. 91-92, 94.); *see also Ripley*, 67 F.3d 552, 557 n. 28 (finding the only evidence of claimant's ability to work came from the claimant's testimony upon which the ALJ considered when making his RFC, and although claimant testified that he went to church, rode in a car, and drove occasionally, the ALJ failed to consider his testimony regarding his limitations in performing those tasks).

that a physician completed a physical RFC assessment or even opined about his ability to perform work-related functions despite his gastro-intestinal impairments). Consequently, substantial evidence does not support the ALJ's RFC determination.  *See Lagrone v. Colvin*, No. 4:12-cv-792-Y, 2013 WL 6157164, at *6 (N.D.Tex. Nov. 22, 2013) (finding substantial evidence did not support the ALJ's RFC determination where the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's physical impairments on his ability to perform work and where there were no such opinions as to claimant's mental impairments); *Newsome v. Barnhart*, No. 3:03-cv-3030-D, 2004 WL 3312833, at *4 (N.D.Tex. Oct. 8, 2004)("[A]lthough the instant record contains some substantial evidence that [the claimant] suffers from 'mild' fibromyalgia that has improved with medication, the record lacks substantial evidence to support the ALJ's findings concerning *the effect* of this condition on her work-related abilities.").

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected," Plaintiff must show she was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing her physical RFC.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam).  To establish prejudice, Plaintiff must show that the ALJ's failure to rely on a medical opinion as to the effects her impairments had on her ability to work casts doubt onto the existence of substantial evidence supporting her disability determination.  *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).  As in *Williams*, the ALJ's failure to rely on a medical opinion in determining Plaintiff's RFC casts doubt as to

20

whether substantial evidence exists to support the ALJ's finding that Plaintiff is not disabled.  *See Williams*, 355 F. App'x at 832 (finding the decision denying the claimant's claim was not supported by substantial evidence where the RFC was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions as to the limitations presented by the claimant's back problems in determining the RFC).[6]

### III.   CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED on this 25th day of March, 2016.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[6]Because the ALJ's proper determination of Plaintiff's RFC on remand will likely affect the remaining issue, it is not addressed.

21